**TREEHOUSE LAW, LLP**
Joseph Hakakian (SBN 323011)
Benjamin Heikali (SBN 307466)
Ruhandy Glezakos (SBN 307473)
Joshua Nassir (SBN 318344)
3130 Wilshire Blvd., Suite 555
Santa Monica, CA 90403
Telephone: (310) 751-5948
jhakakian@treehouselaw.com
bheikali@treehouselaw.com
rglezakos@treehouselaw.com
jnassir@treehouselaw.com

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL XAVIER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FLAGSTONE FOODS LLC d/b/a EMERALD NUTS,<br><br>Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michael Xavier ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, brings this Class Action Complaint against Flagstone Foods LLC d/b/a Emerald Nuts ("Defendant" or "Emerald"), based upon personal knowledge as to himself, and upon information, investigation and belief of his counsel.

## INTRODUCTION

1. Defendant Flagstone Foods LLC is the entity based in the United States responsible for marketing, distributing and selling Emerald-branded snack nut products. Defendant sources, processes, packages and distributes Emerald-branded nut products to premier retail customers across the country, including in this State.

2. This class action lawsuit seeks to challenge Defendant's false and deceptive practices in the marketing and advertising of Emerald's products (collectively, the "Products"). Specifically, the Products include the following: (1) Hot Honey Cashews; (2) Salt & Pepper Cashews; (3) Dill Pickle Cashews; (4) Zesty Sriracha Cashews; (5) Spicy Jalapeno Cashews; (6) Dry Roasted Seasoned Almonds; (7) Cocoa Roast Almonds; (8) Cashew Almonds & Dried Pineapple Snack Packs; (9) Dry Roasted Seasoned Almonds Snack Packs; (10) Salt & Pepper Cashews Snack Packs; (11) Cocoa Roast Almonds Snack Packs; (12) Variety Pack; (13) Salt & Pepper Cashews Individual Snack Tubes; and (14) Cocoa Crunch Nut Blend. [1]

3. Emerald has marketed the Products in a false and misleading manner, representing its Products as having "No Artificial Flavors, Preservatives, or Synthetic Colors."

4. Despite Emerald's "No Artificial Flavors, Preservatives, or Synthetic Colors" marketing and advertising, and unbeknownst to consumers, the Products contain citric acid and maltodextrin, which are both artificial flavors and

[1] *See* **Exhibit A** for a descriptive list of each product and their corresponding ingredients at issue.

preservatives. Thus, Emerald's "No Artificial Flavors, Preservatives, or Synthetic Colors" representations are false and misleading.

5. Plaintiff and other consumers purchased the Products and paid a premium price based upon their reliance on Defendant's "No Artificial Flavors, Preservatives, or Synthetic Colors" marketing and advertising. Had Plaintiff and other consumers been aware that the Products contain artificial flavors and preservatives, they would not have purchased the Products or would have paid significantly less for them. Accordingly, Plaintiff and Class members have been injured by Defendant's deceptive business practices.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure in that: (1) there are more than 100 Class members; (2) the parties are minimally diverse, as Defendant is a citizen of a state different from at least some members of the proposed class, including Plaintiff; and (3) the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs. Thus, there are over 100 members in the proposed class, and the proposed class has different citizenships from Defendant. Plaintiff seeks compensatory and statutory damages, disgorgement and restitution. Plaintiff also seeks punitive damages and attorneys' fees and costs. Thus, Plaintiff estimates that the amount in controversy exceeds $5 million.

7. This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts in California, or otherwise intentionally avails itself of the markets within California through its sale of the Products and other goods in California, to California consumers. Defendant, on its own and through its agents, is responsible for the distribution, marketing, labeling, and sale of the Products in California, specifically in this county. The Court also has specific jurisdiction over

Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit because it has sold deceptively advertised Products to Plaintiff and members of the Class in California. By distributing and selling the Product in California, Defendant has intentionally and expressly aimed conduct at California which caused harm to Plaintiff and the Class that Defendant knows is likely to be suffered by Californians.

8. Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Plaintiff resides in this District and he purchased at least one of the Products in this District during the statute of limitations period.

## PLAINTIFF

9. Plaintiff is a citizen of California and currently resides in Roseville, California. In or around August 2025, Plaintiff purchased Defendant's Emerald Variety Pack from a Walmart retail store in Roseville, California. Based on the representations outlined above, Plaintiff reasonably believed that the Product contained no artificial flavors, preservatives, or synthetic colors. Had he known that this was not the case, he would not have purchased it or would have paid significantly less for it. As such, Plaintiff has been directly financially injured by Defendant's false and misleading marketing and advertising.

10. Despite Defendant's misrepresentations, Plaintiff would purchase the Products, as advertised, if they contained no artificial flavors, preservatives, or synthetic colors. Absent an injunction of Defendant's deceptive marketing and advertising, he will be unable to rely with confidence on Defendant's marketing and advertising of the Products in the future. Furthermore, while Plaintiff currently believes the Products' marketing and advertising is inaccurate, he lacks personal

knowledge as to Defendant's specific business practices, and thus, he will not be able determine whether the Products truly contain no artificial flavors, preservatives, or synthetic colors. This leaves doubt in his mind as to the possibility that at some point in the future the Products could be made in accordance with the representations on the Products' marketing and advertising. This uncertainty, coupled with his desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the alleged misleading representations. In addition, other Class members will continue to purchase the Products, reasonably but incorrectly, believing that they contain no artificial flavors, preservatives, or synthetic colors.

## DEFENDANT

11. Defendant Flagstone Foods LLC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. Moreover, Defendant generates roughly eight-hundred million dollars in annual revenue.

12. Defendant is one of the largest manufacturers and distributors of private label healthy snacks in North America and produces nut products under the Emerald Nuts brand. Defendant sells the Products throughout the United States, including throughout California and in this District specifically.

## FACTUAL ALLEGATIONS

13. Defendant is a prominent packaged-food company that develops, manufactures, markets, and sells Emerald-branded snack nut products. Emerald offers a broad portfolio of snack nuts, including the challenged Products, which are positioned as everyday snacking options for consumers across the United States.

14. Emerald has amassed substantial goodwill and credibility in the snack-foods market, positioning the Emerald brand as a trusted source of high-quality, flavor-forward nut products and reinforcing consumers' confidence in its labeling and marketing representations.

15. Emerald prominently advertises its Products as having "No Artificial Flavors, Preservatives, or Synthetic Colors" on the front of its product packaging. *See examples below.*




16. Moreover, Defendant's off-label advertisement reinforces the perception that the Product contains no artificial flavors, preservatives, or synthetic colors. *See examples below.*









17. Defendant's off-label advertising repeats the same message. Emerald's Products bear the express representation "No Artificial Flavors, Preservatives, or Synthetic Colors," affirming that the Products are free of artificial flavors, preservatives, and synthetic colors.

18. Collectively, the front label and off-label advertising work together to present a unified promise that Emerald's Products do not contain artificial flavors, preservatives, or synthetic colors.

19. Indeed, Emerald's "No Artificial Flavors, Preservatives, or Synthetic Colors" marketing and advertising is central to the Products' identity.

20. Based on the Products' marketing and advertising, reasonable consumers purchase the Products with the expectation that the Products do not contain artificial flavors, preservatives, or synthetic colors.

21. Reasonable consumers, who generally lack specialized scientific or regulatory expertise, are entitled to rely on the front-label representations and brand messaging of a company with this level of prominence, rather than parsing technical ingredient lists or conducting independent research into the nature and function of those specific ingredients. Indeed, studies show that only approximately 7.7% to 11.6% of people even look at the side or back labels of consumer goods, such as ingredient lists, before they buy it.[2]

---

[2] Grunert, Klaus, et. al, *Nutrition knowledge, and use and understanding of nutrition information on food labels among consumers in the UK*, 55 Appetite 177, at 179-181 (2010) available at https://reader.elsevier.com/reader/sd/pii/S0195666310003661?token=95E4146C1BB7D7A7C9A487F22F0B445BD44499550086E04870765EBE116ED32DBFE3795E60B69C75831563CD1BC6655A&originRegion=us-east-1&originCreation=20220720162546 (consumer purchasing behavior study using in-store observation and interview data collection methodology to realistically estimate the degree consumers use nutritional information (found on side/back panels of food product labels and packaging), finding: (1) only **11.6% of respondents**, who looked at a product and placed it in their shopping cart, **were actually observed looking at the side/back panels of its packaging or labels** (panels other than the front panel) before placing it in the cart; (2) of those who looked at the side /back panels, only 31.8% looked at the product "in detail" (i.e., 3.7% of respondents who looked at the product, looked at side/back panels in detail)); and (3) the **respondents self-reported frequency of reviewing side/back panels** (for nutritional

22. The average consumer spends generally not more than 13 seconds to make an in-store purchasing decision.[3] That decision is heavily based upon the product's front labeling because consumers do not have time to review and read every portion of the label and inspect in detail the rear label which depicts in small print the ingredients.

23. Defendant prominently represents that their Products are true to their "No Artificial Flavors, Preservatives, or Synthetic Colors" representations. Consumers reasonably understand these statements to be accurate and complete, and do not expect a well-established brand to mislead them about the presence of artificial flavors, preservatives, or synthetic colors.

24. This is important because consumers value products containing "No Artificial Flavors, Preservatives, or Synthetic Colors." A recent study found that, "Foods bearing 'free-from claims are increasingly relevant to Americans, as they perceive the products as closely tied to health…**84 percent of American free-from**

---

information) **is overreported by 50%** when the in-store interview data and observational data are compared); Grunert, Klaus, et. al, *Use and understanding of nutrition information on food labels in six European countries*, 18(3) Journal of Public Health 261, 261, 263, 266 (2010), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2967247/ (last accessed July 16, 2026) (consumer purchasing behavior study using in-store observation and interview data collection methodology to evaluate whether people look at food labels before buying them, where they looked, and how long they looked, finding: (1) respondents spent, on average, approximately 35 seconds, per product, on products they bought; and (2) 62.6% of respondents looked at the front packaging, and **only 7.7% looked elsewhere (side/back panels) on the packaging**, for products they bought); Benn, Yael, et al., *What information do consumers consider and how do they look for it, when shopping for groceries online*, 89 Appetite 265, 265, 270 (2015), available at https://www.sciencedirect.com/science/article/pii/S0195666315000422#bib0060 (last accessed July 16, 2026) (consumer purchasing behavior study using online eye-movement tracking and recordation, finding: (1) once on the product webpages, respondents tend to look at the pictures of products, rather than examine detailed product information; and (2) by comparison to pictures of products where 13.83-19.07% of respondents fixated, far less fixated on subsidiary information: 4.17% of respondents looked at nutrition information, 3.30% ingredients, 2.97% allergy information, and 0.09% recycling information for example).

[3] Randall Beard, *Make the Most of Your Brand's 20-Second Window*, NIELSEN (Jan. 13, 2015), https://www.nielsen.com/us/en/insights/article/2015/make-the-most-of-your-brands-20-second-windown/ (citing *Shopping Takes Only Seconds… In-Store and Online*, EHRENBERG-BASS INSTITUTE OF MARKETING SCIENCE (2015)) (last visited July 16, 2026).

**consumers buy free-from foods because they are seeking out more natural or less processed foods**. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent). Among the top claims free-from consumers deem most important are trans fat-free (78 percent) and preservative-free (71 percent)."[4]

25. According to another study, when consumers were asked to choose a product that was the closest to their understanding of what "natural" means on product labels, on balance, they chose products with "**No Preservatives**" labels.[5]

26. A recent study explained, "Consumers express concerns about food additives, with 63.7% linking these concerns to human health. This perception influences their purchasing decisions as they prefer products labelled as natural and free of artificial ingredients, indicating a high demand for clean label products."[6]

27. Moreover, "[a]ccording to a survey by Label Insight, 73% of consumers are willing to pay more for products that are free from artificial additives. This indicates a strong demand for clean label products and a willingness to prioritize health and wellness when making purchasing decisions. As consumers become more

---

[4] *84% of Americans buy "free-from" foods because they believe them to be more natural or less processed*, Mintel (Sept. 3, 2015), https://www.mintel.com/press-centre/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed/ (last visited July 16, 2026) (emphasis added).

[5] Sajida Rahman et al., *Assessing consumers' understanding of the term "Natural" on food labeling*, 85 JOURNAL OF FOOD SCIENCE, 1891-1896 (2020), abstract available at https://ift.onlinelibrary.wiley.com/doi/10.1111/1750-3841.15128 ("'Organic' (31%), 'Made with real grains' (17%), and '***No preservatives***' (15%) were the top three chosen labels.") (emphasis added).

[6] Marius-Mihai Ciobanu et al., *The Impact of Artificial and Natural Additives in Meat Products on Neurocognitive Food Perception: A Narrative Review*, 13 FOODS (Dec. 2024), at 8, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11640593/pdf/foods-13-03908.pdf (internal citation omitted).

educated about the potential risks of synthetic preservatives, the demand for natural alternatives is likely to grow even further."[7]

28. Recent published consumer research surveying 400 consumers concluded: "The significance of naturalness has crucial meaning for consumers nowadays. They prefer food free from preservatives, additives or artificial ingredients for perceived naturalness of foods."[8] Thus, "No Artificial Flavors, Preservatives, or Synthetic Colors" representations are highly material to consumers and confer significant perceived value, as they indicate that the product satisfies consumers' strong preference for foods free from artificial flavors, preservatives, and/or synthetic colors.

29. Because consumers reasonably trust large, longstanding food companies to accurately represent the nature of their products, Defendant's branding choices play a critical role in shaping expectations. Emerald's front-label and off-label advertising are designed to leverage that trust by communicating that the Products do not contain artificial flavors, preservatives, or synthetic colors.

30. Unfortunately for consumers, Defendant engages in false and misleading advertising regarding the Products to gain a competitive edge in the market, all at the expense of unsuspecting consumers.

31. Despite the "No Artificial Flavors, Preservatives, or Synthetic Colors" marketing and advertising, and unbeknownst to consumers, the Products contain artificial flavors and preservatives such as citric acid and maltodextrin.

---

[7] ESSFEED.COM, *Consumer Perception of Natural Preservatives and the Demand for Clean Label Products*, (Mar. 19, 2025), https://essfeed.com/consumer-perception-of-natural-preservatives-and-the-demand-for-clean-label-products-consumer-perception-of-natural-preservatives-and-the-demand-for-clean-label-products/.

[8] Paulina Guzik et al., *Consumer Attitudes towards Food Preservation Methods*, 11 Foods 1349 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9099755/ (last visited July 16, 2026).

32. Citric acid is an artificial preservative and flavoring made through the fermentation of *Aspergillus niger*, a type of black mold.[9] The presence of citric acid in the Products contradicts Defendant's "No Artificial Flavors, Preservatives, or Synthetic Colors" marketing and advertising.

33. Defendant uses artificially manufactured citric acid ("MCA") in the Products. Commercial food manufacturers use a synthetic form of citric acid that is derived from heavy chemical processing.[10] Commercially produced citric acid is manufactured using a type of black mold called *Aspergillus niger*, which is modified to increase citric acid production.[11] This is because "[a]proximately 99% of the world's production of [citric acid] is carried out using the fungus *Aspergillus niger* since 1919."[12] As explained by the study published in the *Toxicology Reports Journal*:

> "Citric acid naturally exists in fruits and vegetables. However, **it is *not* the naturally occurring citric acid, but the manufactured citric acid (MCA) that is used extensively as a food and beverage additive**. Approximately 99% of the world's production of MCA is carried out using the fungus *Aspergillus niger* since 1919. *Aspergilus niger* is a known allergen."[13]

---

[9] *Citric Acid,* ScienceDirect, https://www.sciencedirect.com/topics/biochemistry-genetics-and-molecular-biology/citric-acid (last visited July 16, 2026).

[10] A. Hesham et al., *Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates*, 48 Mycobiology 122, 123 (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7178817/.

[11] *Id.*; Pau Loke Show et al., *Overview of Citric Acid Production from Aspergillus niger*, 8 Frontiers in Life Sci. 271, 283 (2015), available at https://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653.

[12] Iliana E. Sweis et al., *Potential Role of the Common Food Additive Manufactured Citric Acid in Eliciting Significant Inflammatory Reactions Contributing to Serious Disease States: A Series of Four Case Reports*, 5 Toxicol. Rep. 808-12 (2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/.

[13] *Id*. (emphasis added).

34. A technical evaluation report for citric acid compiled by the United States Department of Agriculture, Agricultural Marketing Services ("USDA AMS") further explains that it is not commercially feasible to use natural citric acid extracted from fruits:

> "Traditionally by extraction from citrus juice, [is] no longer commercially available. It is now extracted by fermentation of a carbohydrate substance (often molasses) by citric acid bacteria, *Aspergillus niger* (a mold) or *Candida guilliermondii* (a yeast). Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then reacidulated with sulfuric acid."[14]

35. While Defendant lists "Citric Acid" as an ingredient, it does not use the natural organic acid found in citrus fruits, as approximately 99% of global citric acid production uses *Aspergillus niger* fermentation.[15]

36. Instead, Defendant utilizes MCA, an industrial chemical created through a complex biotechnological process produced through microbial fermentation in industrial vats using a genetically filtered strain of black mold (*Aspergillus niger*) followed by chemical extraction processes involving high temperatures, filtration, sulfuric acid precipitation, and potential solvent residues (including *n*-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons per 21 C.F.R. § 173.280). This multi-step industrial process — including sulfuric acid precipitation and solvent use — fits the definition of synthetic under 7 C.F.R. § 205.2, further supporting that MCA deviates from reasonable consumer expectations for food products that advertise "No

---

[14] **Exhibit B** at page 6.

[15] Iliana E. Sweis, et al., *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports,* TOXICOL REP. 5:808-812 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/.

Artificial Flavors, Preservatives, or Synthetic Colors." This distinguishes MCA from naturally extracted citric acid from citrus fruits, which is no longer commercially feasible as confirmed by USDA AMS reports.

37. As one of the USDA AMS reviewers commented:

> "[Citric acid] is a natural[ly] occurring substance that commercially goes through numerous chemical processes to get to [its] final usable form. This processing would suggest that it be ***classified as synthetic***."[16]

38. When asked, "Is this substance Natural or Synthetic?" USDA AMS reviewers state: "Synthetic."[17]

39. The Code of Federal Regulations defines a synthetic substance as one "that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that [it] does not apply to substances created by naturally occurring biological processes." 7 C.F.R. § 205.2. The post-fermentation chemical extraction and refinement steps used to produce MCA in the Products—including sulfuric acid precipitation and solvent use—fit this definition of synthetic, further supporting that the ingredient deviates from reasonable consumer expectations for food products that advertise "No Artificial Flavors, Preservatives, or Synthetic Colors."

40. The U.S. Food and Drug Administration ("FDA") sent warning letters to both Hirzel Canning Company and Oak Tree Farm Dairy, Inc., for products containing citric acid. In those letters, the FDA advised that products labeled "all natural" may not contain artificial or synthetic additives, including citric-acid-based ingredients, because such additives are inconsistent with "all natural" representations. A product containing citric acid, a synthetic preservative, cannot be labeled "all

---

[16] *See* **Exhibit B** at page 5 (emphasis added).
[17] *See* **Exhibit B** at pages 4-5.

natural."[18] Thus, the FDA and other federal agencies have acted under the accordance that MCA is an artificial, non-natural ingredient.[19]

41. The FDA's warning letters are directly relevant here because Emerald's "No Artificial Flavors, Preservatives, or Synthetic Colors" representations are false because they too contain citric acid, the same artificial preservative.

42. The FDA explains that the "solvent extraction process for citric acid" is accomplished via "recovery of citric acid from conventional *Aspergillus niger* fermentation liquor may be safely used to produce food-grade citric acid in accordance with the following conditions: (a) The solvent used in the process consists of a mixture of *n*- octyl alcohol meeting the requirements of § 172.864 of this chapter, ***synthetic*** isoparaffinic petroleum hydrocarbons meeting the requirements of § 172.882 of this chapter, and tridodecyl amine. 21 C.F.R. § 173.280 (emphasis added). Chemical solvents such as *n*-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons are used to extract the citric acid that Defendant uses in the Products from *Aspergillus niger* fermentation liquor. 21 C.F.R § 173.280. The citric acid that Defendant uses in the Products are produced through chemical solvent extraction and contains residues of those chemical solvents.

43. Shown on the following page are images of the chemical process used to create MCA for use in food – a process that is visibly artificial:

///

///

///

///

///

///

---

[18] *See* **Exhibit C** at page 2 and **Exhibit D** at page 2.

[19] *See also* U.S. Int'l Trade Comm'n , Synthetic Organic Chemical Index, USITC Pub. 2933, at 3-105 (Nov. 1995) (listing citric acid as synthetic).






44. Dictionary definitions define "artificial" as something made by man. For example, "artificial" is defined as "made by human skill; produced by humans …"[20] Merriam-Webster's online dictionary states that "artificial" means "humanly contrived …"[21] Cambridge Dictionary states that "artificial" means "made by people, often as a copy of something natural."[22]

45. The FDA defines a preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. §101.22(a)(5). The FDA has listed citric acid as

[20] *Artificial*, Dictionary.com, available at https://www.dictionary.com/browse/artificial (last visited July 16, 2026).
[21] *Artificial*, Merriam-Webster's Dictionary, available at https://www.merriamwebster.com/dictionary/artificial (last visited July 16, 2026).
[22] *Artificial*, Cambridge Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/artificial (last visited July 16, 2026).

a preservative in its "Overview of Food Ingredients, Additives and Colors" as shown on the following page:[23]

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| **Preservatives** | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

46. Moreover, the Encyclopedia Britanica also classifies citric acid as a preservative because it has antioxidant properties: "Food preservatives are classified into two main groups: antioxidants and antimicrobials. Antioxidants are compounds that delay or prevent the deterioration of foods by oxidative mechanisms. Antimicrobial agents inhibit the growth of spoilage and pathogenic microorganisms in food."[24] In the same vein, reasonable consumers understand "preservative" to mean "a chemical used to stop food from decaying."

47. Citric acid acts as an artificial flavoring and preserving agent when added to food products, including the Products at issue, and has a sour, acidic, and slightly tart flavor.[25]

48. The USDA's Food Safety Inspection Service's "Guideline for Label Approval" states that "common **chemical** preservatives include BHA, BHT, calcium

---

[23] *Overview of Food Ingredients, Additives & Colors*, FDA, http://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors, archived at https://web.archive.org/web/20220901032454/http://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors (Sept. 1, 2022).

[24] *Food Additive: Preservatives*, Encyclopedia Britannica, https://www.britannica.com/topic/food-additive/Preservatives (last visited July 13, 2026).

[25] *What Is Citric Acid Used for in Cooking*, WebstaurantStore, https://www.webstaurantstore.com/blog/3350/what-is-citric-acid.html (last visited July 16, 2026).

propionate, **citric acid**, natamycin and sodium propionate."[26] Thus, contrary to Defendant's representations, the Products contain artificial flavors and preservatives.

49. Consumption of MCA has been associated with adverse health events like joint pain with swelling and stiffness, muscular and stomach pain, as well as shortness of breath.[27]

50. Furthermore, the Products also contain maltodextrin, an artificial flavor and preservative. Maltodextrin is an artificial ingredient created through a highly processed mechanism of partially hydrolyzing starch and treating it with acid to break down the polysaccharides.[28]

51. Maltodextrin also aids in preserving the texture and shelf life of products, meeting the FDA's definition of a "chemical preservative" under 21 C.F.R. § 101.22(a)(5).

52. Maltodextrin is not found in nature.[29] To produce maltodextrin, acids, enzymes, or acids and enzymes are applied in sequence to a starch slurry to induce partial hydrolysis (saccharification). In other words, the acids or enzymes convert or depolymerize starch to glucose or maltose molecules.[30] Once maltose content is high enough, the acids or enzymes are neutralized, removed or deactivated, and the resulting product is then refined, purified and concentrated. Synthetic chemicals are often used to extract and purify the enzymes used to produce maltodextrin.

---

[26] *FSIS Guideline for Label Approval*, USDA, https://www.fsis.usda.gov/sites/default/files/media_file/documents/FSIS-GD-2023-0001.pdf (last visited July 16, 2026) (emphasis added).

[27] *Sweis, supra* note 13, at 808-12.

[28] *What is Maltodextrin? Is It Bad for You? Side Effects,* MedicineNet, https://www.medicinenet.com/what_is_maltodextrin_and_is_it_bad_for_you/article.htm (last visited July 16, 2026).

[29] *Is Maltodextrin Natural?*, New Hope Network, https://www.newhope.com/food-and-beverage/is-maltodextrin-natural-(last visited July 20, 2026).

[30] H. Guzman-Maldonado, *Amylolytic Enzymes and Products Derived from Starch: A Review,* 35(5) CRIT. REV. FOOD SCI. NUTR. 373 (Sept. 1995).

53. As a result of this chemical process, maltodextrin appears as a white, water-soluble powder with a neutral to mildly sweet flavor that varies in perceived sweetness depending on its degree of polymerization.

54. Given the nature of this manufacturing process, rules proposed by the FDA recognize that maltodextrin is a synthetic ingredient. 72 Fed. Reg. 62149, 62166 (proposed Nov. 2, 2007).

55. In addition to being a sweetener, maltodextrin acts as a preservative by reducing water activity. It inhibits the growth of microorganisms and extends the shelf-life of processed foods by slowing or preventing the formation of bacteria, mold, yeast, and fungus.

56. Maltodextrin is widely used in processed foods as a thickener, texturizing agent, stabilizer and complementary sweetener, enhancing texture and mouthfeel while also contributing sweetness and extending shelf life.

57. Maltodextrin is an artificial flavor and preservative in the Products, regardless of Defendant's intention in using it. On information and belief, Defendant employs chemists to formulate the Products and, on that basis, knew or should have known maltodextrin is both a chemical preservative and flavoring agent.

58. Consumption of maltodextrin has been associated with adverse health effects like spikes in blood sugar, gastrointestinal symptoms such as cramping and bloating, and causing intestinal disorders by aiding the bacteria known to hurt the intestine. Moreover, research has identified several health issues including cancer, Alzheimer's disease, kidney damage, reproduction difficulties, and allergies that can be caused due to maltodextrin produced from genetically modified corn.[31]

59. As demonstrated in Exhibit A, the Products all bear identical front-label representations, packaging design, and marketing. Each of the Products are labeled

[31] Joana Cavaco Silva, *What Is Maltodextrin and Is It Safe?*, Medical News Today (Mar. 21, 2024), https://www.medicalnewstoday.com/articles/322426#safety-and-side-effects (last visited July 20, 2026).

with the same "No Artificial Flavors, Preservatives, or Synthetic Colors" representations, in the same format and placement. Furthermore, the Products contain the same ingredients that give rise to Plaintiff's claims.

60. Reasonable consumers, including Plaintiff, relied on these uniform representations when purchasing the Products, regardless of which specific Product they purchased, because the representations and the underlying deceptive practice are identical across the entire product line. Although Plaintiff did not personally purchase every Product identified in Exhibit A, the false and misleading nature of Defendant's "No Artificial Flavors, Preservatives, or Synthetic Colors" representations are pervasive across the entire line, such that Plaintiff's claims are typical of, and adequately represent, all purchasers of the Products.

61. Defendant has profited enormously from its false and misleading representations that the Products do not contain artificial flavoring, preservatives, or synthetic colors. The purpose of this action is to require Defendant to change its labeling claims and to provide consumers with monetary relief for its deceptive and misleading product claims.

62. Notably, Emerald does not disclose on its product packaging that the Products include artificial flavors and preservatives. Consequently, consumers have no reasonable basis to believe or anticipate that the Products differ from Emerald's claims that they contain no artificial flavors, preservatives, or synthetic colors.

63. This is not what consumers expect when it comes to Emerald snack nut Products. Consumers expect Emerald's Products to live up to their no artificial flavors, preservatives, or synthetic colors representations.

64. The reasonable belief that the Products do not contain artificial flavors, preservatives, or synthetic colors was a significant factor in Plaintiff and other class members' decisions to purchase the Products. "No Artificial Flavors, Preservatives, or Synthetic Colors" representations are important to consumers because consumers

expect to receive premium ingredients, and consumers value them over the less premium and cheaper non-natural ingredients (such as citric acid and maltodextrin) found in the Products. Thus, Emerald promises premium products, but provides consumers with cheaper, less premium alternatives.

65. As the entity responsible for the development, naming, manufacturing, advertising, distribution and sale of the Products, Defendant knew or should have known that the Products falsely and deceptively represent to contain certain ingredients that they do not contain.

66. Defendant also knew or should have known that Plaintiff and other consumers, in purchasing the Products, would rely on Defendant's advertising. Nonetheless, Defendant deceptively advertises the Products in order to deceive consumers and gain an unfair advantage in the market.

67. Consumers are willing to pay more for the Products based on the belief that the Products do not contain artificial flavors, preservatives, or synthetic colors. Plaintiff and other consumers would have paid significantly less for the Products, or would not have purchased them at all, had they known that the truth about them. Thus, through the use of misleading representations, Defendant commands a price that Plaintiff and the Class would not have paid had they been fully informed.

68. Despite Defendant's misrepresentations, Plaintiff and Class members would purchase the Products, as advertised, if they in fact contained no artificial flavors, preservatives, or synthetic colors. Absent an injunction prohibiting Defendant's deceptive marketing and advertising practices, Plaintiff and Class members will be unable to rely with confidence on Defendant's representations about the Products in the future. Moreover, while Plaintiff and Class members currently believe the Products' marketing and advertising are inaccurate, they lack personal knowledge of Defendant's specific formulation and labeling practices and therefore cannot determine whether the Products truly contain no artificial flavors,

preservatives, or synthetic colors at any given time. This uncertainty, combined with their desire to purchase the Products if truthfully labeled and marketed, constitutes an ongoing injury that can and would be remedied by an injunction enjoining Defendant from making the misleading representations alleged herein. In the absence of such injunctive relief, Defendant will continue to mislead consumers, who will reasonably but incorrectly believe that the Products do not contain artificial flavors, preservatives, or synthetic colors.

69. Therefore, Plaintiff and other consumers purchasing the Products have suffered financial injury in fact and lost money as a result of Defendant's false and deceptive practices, as described herein.

## CLASS DEFINITIONS AND ALLEGATIONS

70. Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3), on behalf of himself and the members of the following proposed multi-state class ("Multi-State Consumer Protection Class")[32]:

> During the fullest period allowed by law, all persons who purchased the Product in the state of California or any state with similar laws,[33] within the applicable statute of limitations for

[32] Unless otherwise specified, all references in this Complaint to "Classes" or the "Class" refer collectively to the Multi-State Consumer Protection Class and California Class.

[33] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Alaska (AS §§ 45.50.471, *et seq.*), Arkansas (Ark. Code §§ 4-88-101, *et seq.*), California (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq*), Delaware (Del. Code tit. 6, §§ 2511, *et seq.*), District of Columbia (D.C. Code §§ 28-3901, *et seq.*), Florida (Fla. Stat. §§ 501.201, *et seq.*), Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq.*), Illinois (815 ICLS §§ 501/1, *et seq.*), Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*), Michigan (Mich. Comp. Law §§ 445.901, *et seq.*), Minnesota (Minn. Stat. §§ 325F.67, *et seq.*), Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*), New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*), New York (N.Y. Gen. Bus. Law. §§ 349, *et seq*. and §§ 350, *et seq.*), Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*), Vermont (Vt. Stat. tit. 9, §§ 2451, *et seq.*), Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*), and Wisconsin (Wis. Stat. §§ 100.18, *et seq.*). *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 96 (2d Cir. 2018); *Mancuso v. RFA Brands, LLC*, 454 F. Supp. 3d 197, 201, 204 (W.D.N.Y. 2020); *see also Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, *9-10 (N.D. Ill. Nov. 16, 2021) (certifying a similar multi-state consumer protection class).

personal use and not resale, until the date notice is disseminated.

71. Plaintiff further brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) on behalf of himself and the members of the following class ("California Class"):

> During the fullest period allowed by law, all persons who purchased the Product in the State of California, within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

72. Members of the Multi-State Consumer Protection Class and California Class are referred to collectively as the "Class members." Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiff reserves the right to amend the Class definition, as necessary.

73. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence that individual Class members would use to prove those elements in individual actions alleging the same claims.

74. Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether class certification is appropriate.

75. Plaintiff is a member of all the Classes.

76. <u>**Numerosity**</u>**:** Members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff but is likely to be ascertained by the Defendant's records. At a minimum, there likely are thousands of Class members.

77. **Commonality:** There are questions of law and fact common to the proposed class(es). Common questions of law and fact include, without limitations:

a. whether Defendant's course of conduct alleged herein violates the statutes and other laws that are pled in this Complaint;
b. whether reasonable consumers would rely upon Defendant's representations about the Products and reasonably believe the Products did not contain artificial flavors, preservatives, or synthetic colors;
c. whether Defendant knew or should have known its representations were false or misleading;
d. whether Defendant was unjustly enriched by retaining monies from the sale of the Products;
e. whether certification of each Class is appropriate under Rule 23;
f. whether Plaintiff and the members of each Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief; and
g. the amount and nature of the relief to be awarded to the Plaintiff and the Classes, including whether Plaintiff and the Classes are entitled to punitive damages.

78. **Typicality:** Plaintiff's claims are typical of the other Class members because Plaintiff, as well as Class members, purchased the Products and relied on the representations made by the Defendant about the Products prior to purchasing the Products. Plaintiff and the members of each Class paid for Defendant's Products and would not have purchased them (or would have paid substantially less for them) had they known that the Defendant's representations were untrue.

79. **Adequacy:** Plaintiff will fairly and adequately protect the interests of the proposed Classes as his interests do not conflict with the interests of the members of

the proposed Classes he seeks to represent, and he has retained counsel competent and experienced in class action litigation. Thus, the interests of the members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

80. **Predominance:** Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Complaint predominate over any other questions affecting only individual members of the Classes. Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's misconduct detailed at length in this Complaint.

81. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of hundreds of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in the Complaint/lawsuit. Further, because of the damages suffered by any individual Class member may be relatively modest in relation to the cost of litigation, the expense and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class members may be unaware that claims exist against the Defendant.

82. **Declaratory and Injunctive Relief:** Pursuant to Rule 23(b)(2), declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law.

## FIRST CLAIM FOR RELIEF

**Violation of State Consumer Protection Statutes**

***(By Plaintiff, individually, and on behalf of the Multi-State Consumer Protection Class)***

83. Plaintiff repeats the allegations contained in paragraphs 1-82 above as if fully set forth herein.

84. Plaintiff and the Multi-State Consumer Protection Class members were injured as a result of Defendant's violations of the state consumer protection statutes listed in paragraph 70, footnote 33, above. These state consumer protection statutes provide a basis for redress to Plaintiff and the Multi-State Consumer Protection Class based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

85. Defendant's conduct, as alleged herein, violates the consumer protection, unfair trade practices, and deceptive laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

86. Defendant's marketing of the Products violates these prohibitions by deceiving consumers into believing that the "No Artificial Flavors, Preservatives, or Synthetic Colors" representations are truthful and reliable, when in fact they are false.

87. Defendant engaged in fraudulent and/or deceptive conduct which creates the likelihood of confusion or misunderstanding in violation of applicable law.

88. Specifically, Defendant advertised in a misleading and deceptive manner that the Products do not contain artificial flavors, preservatives, or synthetic colors. Defendant chose to package, label and market the Products in this way to impact consumer choices, extract price premiums and gain market dominance, as it is aware that all reasonable consumers who purchase the Products would be impacted by, and would reasonably believe, its false and misleading representations.

89. Defendant intended for Plaintiff and Multi-State Consumer Protection Class members to reasonably rely upon the material misrepresentations concerning the true nature of the Products.

90. Defendant's misrepresentations and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, did cause Plaintiff and Multi-State Consumer Protection Class members to be deceived about the true nature of the Products.

91. As a direct and proximate result of Defendant's misrepresentations, Plaintiff and Multi-State Consumer Protection Class members suffered ascertainable losses.

92. Had they been aware of the true nature of the Products, Plaintiff and Multi-State Consumer Protection Class members either would have paid less for the Products or would not have made the purchases at all.

93. Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Protection Class members are entitled to recover compensatory, restitution, punitive and special damages, including, but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted by relevant law.

**SECOND CLAIM FOR RELIEF**
**Violation of California's Consumers Legal Remedies Act**
**California Civil Code § 1750, *et seq.***
**(*By Plaintiff, individually, and on behalf of the California Class*)**

94. Plaintiff repeats the allegations contained in paragraphs 1-82 above as if fully set forth herein.

95. Plaintiff brings this claim individually and on behalf of the members of the proposed California Consumer Subclass against Defendant pursuant to California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*.

96. The Products are "good[s]" within the meaning of Cal. Civ. Code § 1761(a), and the purchases of the Products by Plaintiff and members of the California

Consumer Subclass constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

97. Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have[.]" By using representations about the Products not containing artificial flavors, preservatives, or synthetic colors, Defendant has represented and continues to represent that the Products do not contain artificial flavors or preservatives (i.e., does not contain MCA or maltodextrin). Therefore, Defendant has violated and continues to violate section 1770(a)(5) of the CLRA.

98. Cal. Civ. Code § 1770(a)(7) prohibits "[r]espresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By making "No Artificial Flavors, Preservatives, or Synthetic Colors" representations when marketing and advertising the Products, Defendant has represented and continues to represent that the Products are of a particular standard and do not contain artificial flavors or preservatives, when none of those representations are true because the Products contain MCA and maltodextrin. Therefore, Defendant has violated and continues to violate section 1770(a)(7) of the CLRA.

99. Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By marketing and advertising the Products as containing no artificial flavors, preservatives, or synthetic colors, Defendant has advertised the Products with characteristics it intended not to provide to consumers. As such, Defendant has violated and continues to violate section 1770(a)(9) of the CLRA.

100. At all relevant times, Defendant has known or reasonably should have known that the marketing and advertising of its Products with "No Artificial Flavors, Preservatives, or Synthetic Colors" representations are false and deceptive, and that

Plaintiff and other members of the California Class would reasonably and justifiably rely on these representations when purchasing the Products. Nonetheless, Defendant deceptively advertise the Products as such in order to deceive consumers into believing they do not contain artificial flavors, preservatives, or synthetic colors.

101. Plaintiff and members of the California Class have justifiably relied on Defendant's misleading representations when purchasing the Products. Moreover, based on the materiality of Defendant's misleading and deceptive conduct, reliance may be presumed or inferred for Plaintiff and members of California Consumer Class.

102. Plaintiff and members of the California Class have suffered and continue to suffer injuries caused by Defendant because they would have paid significantly less for the Products, or would not have purchased them at all, had they known that the Products contain artificial flavors and preservatives.

103. Under Cal. Civ. Code § 1782, on September 25, 2025, the undersigned counsel sent Defendant a notice letter through certified mail, notifying Defendant of its violations under the CLRA (as well as other statutes and laws). More than 30 days have passed since Defendant's receipt of that notice letter, yet Defendant has refused to cure its false and deceptive conduct on a class-wide basis. As such, this Complaint seeks damages under the CLRA, as well all other available remedies. Because Defendant has failed to fully rectify the issues within 30 days after receipt of the notice and demand letter, Plaintiff timely filed this Class Action Complaint for a claim for damages under the CLRA.

**<u>THIRD CLAIM FOR RELIEF</u>**
**Violation of California's False Advertising Law**
**California Business & Professions Code § 17500, *et seq***
**(*By Plaintiff, individually, and on behalf of the California Class)***

104. Plaintiff repeats the allegations contained in paragraphs 1-82 above as if fully set forth herein.

105. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant pursuant to California's False Adverting Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*.

106. The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

107. Defendant has violated the FAL by disseminating uniform, unqualified representations on the Products' front labels, packaging, and off-label advertising that the Products contain "No Artificial Flavors, Preservatives, or Synthetic Colors." Under the reasonable consumer test, these claims are likely to deceive members of the public into believing that the Products do not contain artificial flavors, preservatives, or synthetic colors.

108. Defendant's front-label, off-label, and branding representations, including the prominent "No Artificial Flavors, Preservatives, or Synthetic Colors" statement, is likely to deceive reasonable consumers into believing the Products are not made with artificial flavors, preservatives, or synthetic colors.

109. These challenged representations are unambiguously deceptive because they contain no asterisks, percentages, qualifying language, or clarifying disclosures informing consumers that the Products in fact contain artificial flavors and preservatives, including MCA and maltodextrin.

110. Defendant knew, or by the exercise of reasonable care should have known, that these representations were untrue and misleading because Defendant formulated, marketed, labeled, and sold the Products with those ingredients while sim-

ultaneously representing that the Products contain "No Artificial Flavors, Preservatives, or Synthetic Colors."

111. Plaintiff and the California Class have standing to bring this claim because they lost money or property as a result of Defendant's FAL violations. Specifically, they relied on Defendant's false advertising and paid a premium price for Products they believed contained no artificial flavors or preservatives and that they otherwise would not have purchased, or would have purchased only at a lower price, had the truth been disclosed.

112. Defendant has represented and continues to represent to the public, including Plaintiff and members of the proposed California Class, through its deceptive marketing and advertising, that the Products are of a particular standard and do not contain artificial flavors or preservatives, when that is not true. Because Defendant has disseminated misleading information regarding the Products, and Defendant knows, knew, or should have known through the exercise of reasonable care that the representations were and continue to be misleading, Defendant has violated the FAL.

113. As a direct result of Defendant's false advertising, Defendant has obtained, and continues to obtain, unlawful profits at the expense of Plaintiff and the California Class. Plaintiff therefore requests that the Court: (a) enjoin Defendant from continuing these deceptive practices; (b) order the restitution of all money fraudulently obtained; and (c) order the disgorgement of profits earned through these transactions.

114. Plaintiff and the California Class will be irreparably harmed without an injunction, as Defendant continues to sell the Products using deceptive labels that prevent Plaintiff from making informed purchasing decisions in the future.

///

///

**FOURTH CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.***
**(*By Plaintiff, individually, and on behalf of the California Class*)**

115. Plaintiff repeats the allegations contained in paragraphs 1-82 above as if fully set forth herein.

116. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant pursuant to California Business & Professions Code § 17200.

117. The UCL, Cal. Bus. & Prof. Code § 17200, provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising[.]"

118. Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law. Defendant's false and misleading advertising of the Products was and continues to be "unlawful" because it violates the CLRA, the FAL, and other applicable laws as described herein. As a result of Defendant's unlawful business acts and practices, Defendant has unlawfully obtained money from Plaintiff and members of the proposed California Class.

119. Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

120. Defendant's conduct was and continues to be of no benefit to purchasers of the Products, as it is misleading, unfair, unlawful, and is injurious to consumers who rely on the marketing and advertising. Therefore, Defendant's conduct was and continues to be "unfair." As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from Plaintiff and members of the proposed California Class.

121. Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public.

122. Defendant's conduct here was and continues to be fraudulent because, due to the Products' "No Artificial Flavors, Preservatives, or Synthetic Colors" representations, it has the effect of deceiving consumers into believing the Products do not contain artificial flavors or preservatives (i.e., does not contain MCA and maltodextrin). Because Defendant misled Plaintiff and members of the California Class, Defendant's conduct was "fraudulent." As a result of Defendant's fraudulent business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiff and members of the California Class.

123. Plaintiff requests that the Court cause Defendant to restore this unlawfully, unfairly, and fraudulently obtained money to him, and members of the proposed California Class, to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from violating the UCL or violating it in the same fashion in the future as discussed herein. Otherwise, Plaintiff and members of the proposed California Class may be irreparably harmed and/or denied an effective and complete remedy.

## FIFTH CLAIM FOR RELIEF
## Breach of Express Warranty
## Cal. Com. Code § 2313
**(*By Plaintiff, individually, and on behalf of the California Class*)**

124. Plaintiff repeats the allegations contained in paragraphs 1-82 above as if fully set forth herein.

125. Plaintiff brings this claim individually and on behalf of the members of the California Class against Defendant for breach of express warranty under Cal. Com. Code § 2313.

126. California's express warranty statutes provide that "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and

becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Cal. Com. Code § 2313.

127. Defendant expressly warranted on the Products' packaging, labeling, marketing, and advertising that the Products contain "No Artificial Flavors, Preservatives, or Synthetic Colors." This representation constitutes an affirmation of fact and promise relating to the characteristics, ingredients, and composition of the Products within the meaning of Cal. Com. Code § 2313. The representation is specific, objective, and capable of being proven true or false by reference to the Products' ingredients and composition. It is not mere puffery, opinion, or generalized marketing language. Rather, it communicates to consumers that the Products do not contain artificial flavors, preservatives, or synthetic colors.

128. Defendant prominently displayed the "No Artificial Flavors, Preservatives, or Synthetic Colors" representation on the front-label of the Products and repeated the same representation through off-label advertising and marketing materials to induce consumers to purchase the Products. This affirmation of fact became part of the basis of the bargain between Defendant and Plaintiff because Plaintiff saw, understood, and relied upon the representation in deciding to purchase the Products and paid a premium price as a result.

129. The Products did not conform to Defendant's express affirmation of fact because they contain artificial flavors and/or preservatives, including MCA and maltodextrin, as alleged herein. Accordingly, Defendant breached its express warranty that the Products contain "No Artificial Flavors, Preservatives, or Synthetic Colors."

130. Unlike generalized advertising slogans or subjective statements of product superiority, Defendant's representation that the Products contain "No

Artificial Flavors, Preservatives, or Synthetic Colors" is a concrete factual representation concerning the Products' ingredients and composition. Whether that representation is true or false is objectively verifiable by examining the Products' ingredients and the nature of those ingredients. Indeed, the truth or falsity of Defendant's representation is capable of objective determination under applicable federal food-labeling regulations governing artificial flavors and chemical preservatives, including 21 C.F.R. § 101.22. Accordingly, Defendant's representation constitutes an express warranty under Cal. Com. Code § 2313.

131. The truth or falsity of Defendant's representation does not depend upon subjective consumer opinion or individual preference. Rather, it depends upon whether the Products in fact contain artificial flavors or preservatives. Because Defendant expressly represented that the Products contain "No Artificial Flavors, Preservatives, or Synthetic Colors," and the Products do contain such ingredients, Defendant's express warranty was breached.

132. Defendant's "No Artificial Flavors, Preservatives, or Synthetic Colors" representations on the Products' marketing and advertising are: (a) affirmations of fact or promises made by Defendant to consumers that the Products contain no artificial flavors, preservatives, or synthetic colors; (b) became part of the basis of the bargain to purchase the Products when Plaintiff and other consumers relied on the representations; and (c) created an express warranty that the Products would conform to the affirmations of fact or promises. In the alternative, the representations about the Products are descriptions of goods which were made as part of the basis of the bargain to purchase the Products, and which created an express warranty that the Products would conform to the product descriptions.

133. Plaintiff and members of the California Class reasonably and justifiably relied on the foregoing express warranties, believing that the Products did in fact conform to those warranties and not contain artificial flavors or preservatives.

134. Defendant has breached the express warranties made to Plaintiff and members of the California Class by failing to provide the Plaintiff with products free from artificial flavors or preservatives as promised in the Products' marketing and advertising.

135. Plaintiff and members of the California Class paid a premium price for the Products but did not obtain the full value of the Products as represented. If Plaintiff and members of the California Class had known of the true nature of the Products, they would not have been willing to pay the premium price associated with them. As a result, Plaintiff and members of the California Class suffered injury and deserve to recover all damages afforded under the law.

136. Upon discovery of this breach, on September 25, 2025, Plaintiff, through the undersigned counsel notified Defendant of its breach of warranty by way of a notice letter outlining the foregoing allegations.

**SIXTH CLAIM FOR RELIEF**
**Breach of Implied Warranty**
**Cal. Com. Code § 2313**
**(*By Plaintiff, individually, and on behalf of the California Class*)**

137. Plaintiff repeats the allegations contained in paragraphs 1-82 above as if fully set forth herein.

138. Plaintiff brings this claim individually and on behalf of the members of the California Class against Defendant.

139. California's implied warranty of merchantability statute provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

140. California's implied warranty of merchantability statute also provides that "[g]oods to be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or label if any." Cal. Com. Code § 2314(2)(f).

141. Plaintiff is an intended third-party beneficiary of the agreements through which Defendant manufacture, distribute, market, and sell the Products to retailers for ultimate purchase by consumers. Defendant specifically designed, labeled, marketed, and advertised the Products for consumers such as Plaintiff, and the warranties accompanying the Products were intended to induce consumers to purchase the Products. Accordingly, Plaintiff is entitled to enforce the implied warranties accompanying the Products.

142. Defendant exercised exclusive control over the Products' formulation, packaging, labeling, and advertising, including the challenged "No Artificial Flavors, Preservatives, or Synthetic Colors" representation. Retailers merely sold the Products as packaged and labeled by Defendant. The warranties at issue originated with Defendant and were directed to consumers, including Plaintiff, who were the intended recipients of those warranties.

143. Under California law, privity is not required where plaintiffs are the intended third-party beneficiaries of an implied warranty. Plaintiff is the intended third-party beneficiary of the contracts between Defendant and its retailers. Defendant designed its marketing to reach consumers. Defendant uses packaging, websites, and off-label advertising to dictate what the Products contain and why consumers should purchase them. Defendant's representations target consumers, not retailers. Thus, privity is no shield for affirmative deception and Defendant cannot inject misrepresentations into the marketplace and then hide behind its supply chain.

144. Defendant is a merchant with respect to the sale of Products. Therefore, a warranty of merchantability is implied in every contract for sale of the Products to California consumers.

145. By advertising the Products as "No Artificial Flavors, Preservatives, or Synthetic Colors," Defendant made an implied promise that the Products do not contain artificial flavors or preservatives. However, the Products have not "conformed

to the promises" because the Products contain artificial flavors and preservatives. Plaintiff, as well as other California consumers, did not receive the goods as impliedly warranted by Defendant. Therefore, the Products are not merchantable under California law as Defendant has breached its implied warranty of merchantability in regard to the Products.

146. Because the Products contain synthetic, industrially processed ingredients including MCA and maltodextrin, they fail to conform to the labeling promises. Consequently, the Products are not merchantable as labeled and do not possess the quality represented by Defendant.

147. If Plaintiff and members of the California Class had known that the Products' "No Artificial Flavors, Preservatives, or Synthetic Colors" representations were false and misleading, they would not have been willing to pay the premium price associated with them. Therefore, as a direct and/or indirect result of Defendant's breach, Plaintiff and members of the California Class have suffered injury and deserve to recover all damages afforded under the law.

148. On September 25, 2025, the undersigned counsel notified Defendant of its breach of warranty by way of a notice letter outlining the foregoing allegations.

**SEVENTH CLAIM FOR RELIEF**
**Quasi Contract/Unjust Enrichment/Restitution**
**(*By Plaintiff, individually, and on behalf of the for the Multi-State Consumer Protection Class; alternatively, for the California Class*)**

149. Plaintiff repeats the allegations contained in paragraphs 1-82 above as if fully set forth herein.

150. Plaintiff brings this claim individually and on behalf of the Multi-State Consumer Class, or in the alternative on behalf of the California Class.

151. As alleged herein, Defendant has intentionally and recklessly made misleading representations to Plaintiff and members of the Classes to induce them to purchase the Products. Plaintiff and members of the Classes have reasonably relied

on the misleading representations and have not received all of the benefits (i.e., Products that are free from artificial flavors, preservatives, or synthetic colors) promised by Defendant through the Products' "No Artificial Flavors, Preservatives, or Synthetic Colors" representations. Plaintiff and members of the proposed Classes have therefore been induced by Defendant's misleading and deceptive representations about the Products, and paid more money to Defendant for the Products than they otherwise would and/or should have paid.

152. Plaintiff and members of the proposed Classes have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiff and members of the proposed Classes.

153. The monies received were obtained under circumstances that were at the expense of Plaintiff and members of the proposed Classes—i.e., Plaintiff and members of the proposed Classes did not receive the full value of the benefit conferred upon Defendant. Therefore, it is inequitable and unjust for Defendant to retain the profit, benefit, or compensation conferred upon them.

154. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and members of the proposed Classes are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from their deceptive, misleading, and unlawful conduct as alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Classes, respectfully prays for the following relief:

A. Certification of this case as a class action on behalf of the proposed Classes defined above, appointment of Plaintiff as Class representative, and appointment of his counsel as Class Counsel;

B. A declaration that Defendant's actions, as described herein, violate the claims described herein;

C. An award to Plaintiff and the proposed Classes of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the proposed Classes as a result of its unlawful, unfair and fraudulent business practices described herein;

D. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct;

E. An award of nominal, punitive, and statutory damages;

F. An award to Plaintiff and his counsel of reasonable expenses and attorneys' fees;

G. An award to Plaintiff and the proposed Classes of pre and post-judgment interest, to the extent allowable; and

H. For such further relief that the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the proposed Classes, hereby demands a jury trial with respect to all issues triable of right by jury.

DATED: July 29, 2026

**TREEHOUSE LAW, LLP**

By: */s/ Joseph Hakakian*

Joseph Hakakian (SBN 323011)
Benjamin Heikali (SBN 307466)
Ruhandy Glezakos (SBN 307473)
Joshua Nassir (SBN 318344)
3130 Wilshire Blvd. Suite 555
Santa Monica, CA 90403
Telephone: (310) 751-5948
jhakakian@treehouselaw.com
bheikali@treehouselaw.com
rglezakos@treehouselaw.com
jnassir@treehouselaw.com

*Attorneys for Plaintiff and the Putative Classes*

Vinesign Document ID: D90244EB-0372-4149-ACAA-20FF3302A427


**Venue Declaration Pursuant to Cal. Civ. Code 1780(d)**

I, Michael Xavier, declare as follows:

1. I am the named Plaintiff in the above-captioned action and am a citizen of the State of California. I have personal knowledge of the facts set forth in this declaration and am competent to testify to the same. The matters set forth herein are true and correct to the best of my knowledge and belief.
2. Pursuant to California Civil Code Section 1780(d), I believe that the Eastern District of California is the proper place for trial of this case because I reside in this District, and I purchased one of the challenged Products in this District.

I declare under penalty of perjury that the foregoing is true and correct, executed on 07/28/2026 in Roseville, California.

Michael Xavier

The signed document can be validated at https://app.vinesign.com/Verify